

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| ROB SANDERS, | ) |
| | ) |
| Respondent, | ) |
| | )    **WD78460** |
| v. | ) |
| | )    **OPINION FILED:** |
| | )    **February 9, 2016** |
| CITY OF COLUMBIA, MISSOURI, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Patricia S. Joyce, Judge**

**Before Division II:** Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and James Edward Welsh, Judges

The City Manager of the City of Columbia, Missouri ("City"), made a final determination that Rob Sanders ("Sanders") should be terminated from his employment as a police officer. Sanders petitioned the Circuit Court of Cole County, Missouri ("circuit court"), to review the City's decision. The circuit court reversed the City's decision and ordered Sanders's reinstatement. The City appeals.[1] Because the circuit court did not have statutory authority to consider review of this case as a *contested* case, we reverse the circuit court's judgment and

---

[1] Although the City filed this appeal as the party aggrieved by the circuit court's judgment, Sanders filed the appellant's brief under Rule 84.05(e) because he was aggrieved by the City's decision.

remand the case for judicial review of the matter as a *noncontested* case pursuant to section 536.150.[2]

**Factual and Procedural Background**

Sanders was hired by the Columbia Police Department in 1993. In 2011, he was a K-9 officer assigned to the Patrol division. He was also a firearms and pursuit driving instructor for the Department. He had received in-service training in defensive tactics.

On August 15, 2011, Columbia Police Officers Kasper and Sedgwick were dispatched to 211 Sanford Avenue to arrest Kenneth Baker on two outstanding felony warrants. Baker, who was intoxicated, resisted and violently fought with the officers for about two minutes. Both officers delivered numerous closed fist strikes to Baker with little effect. Officer Kasper called for emergency assistance. In an effort to subdue Baker, Officer Sedgwick pepper sprayed Baker in the face, but it seemed to have very little effect. The officers were eventually able to pull Baker face down onto the floor and handcuff him. Some of this incident was broadcast over the open microphone of one of the officers. Sanders heard the struggle over the open microphone and responded to the call for emergency assistance.

Officer Crites was the first officer to arrive at the scene to assist the arresting officers. Sanders arrived shortly thereafter. Officer Crites took custody of Baker and escorted him to the patrol car. Baker was yelling and pulling away from Officer Crites. Before transporting Baker to the police station, Officer Crites attempted to search him. Baker resisted the search, and Officer Crites had to use force, including a wrist lock, to hold him down on the rear of the patrol car so the search could be completed.

Officer Crites transported a belligerent Baker to the police station, followed by Sanders. At the station, Sanders offered to speak to Baker to try to establish rapport. Sanders offered to

_____

[2] All statutory references are to the Revised Statutes of Missouri 2000, as updated.

2

help Baker wash the pepper spray from his face if he would behave and cooperate. Baker agreed, and Sanders spent over four minutes washing Baker's eyes and helping him blow his nose until Baker told him that he was ready to go on with the booking procedure.

Because the arresting officers had not yet returned to the police station to start the booking process, Sanders and Officer Crites took Baker to a holding cell. Sanders gave Baker a paper towel so he could fan his face to dissipate the pepper spray. In the booking area, Sanders and Officer Crites looked for decontamination wipes to give to Baker to alleviate the effects of the pepper spray, but they could not find any.

Baker tried the sink in the holding cell, but the sink was not working and had not worked for many years. Baker banged on the cell door, demanding that the officers turn on the water. Sanders returned to the cell and instructed Baker that people were not allowed to beat on the holding cell doors. Baker asked questions about the water, and Sanders told him that the water did not work and that no water was accessible; Baker needed time and air and should fan himself to reduce the effects of the pepper spray. Sanders advised him, "Sir, I'm sorry, there's no water in the holding cell." Baker again demanded water. Sanders told him, "The only water in the holding cell is that in the toilet." Baker said he was not using that, and Sanders responded, "I don't blame you, I wouldn't do it either." Sanders warned Baker, "You cannot beat on the holding cell door or you'll be placed on the ring behind you on the floor; it's very uncomfortable."

Baker again pounded on the cell door. Sanders, and Officers Crites and Hibler returned to the cell; after a few seconds, Sanders opened the door and asked Baker to have a seat at the back of the holding cell so that he could be placed on the ring. Baker's response was, "Fuck you." Sanders responded, "Sir, is there anything that I can say or do to make you peacefully

3

have a seat at the back of the holding cell without using physical force against you?" Baker responded with the same curse.

Sanders observed Baker coming forward in the cell. Because the cell door is not wide enough to fit more than one officer through at a time, Sanders entered the cell first. Although Sanders normally would use a leg sweep to take someone down in that situation, he determined that he did not have enough room to use that technique. Sanders's second option was to push Baker over on his buttocks or back and then take him over to the holding cell ring and cuff him to it. When Sanders pushed Baker, rather than stumbling backwards or going down on his buttocks, Baker went several feet back into the rear wall of the cell and struck his head. The other two officers entered the cell with Sanders, and the three of them cuffed Baker to the ring at the back of the cell.

When the officers withdrew to the outside of the holding cell, Sanders noticed blood on his arm. When the officers determined that it was Baker's blood, they went back to the holding cell to check on Baker. They found a one-inch cut on the back of Baker's head and a drop of blood on the holding cell floor. Baker never lost consciousness and threatened to kill Sanders. When the officers exited the cell, they requested medical assistance for Baker. After about twelve minutes, the paramedic arrived and determined that Baker should go to the hospital. Baker was transported to the hospital by officers.

In response to seeing the video of this incident in the holding cell, Police Chief Burton's initial reaction was to fire Sanders, but Captain Bernhard counseled him to let the internal affairs investigation run its course. Chief Burton relented and requested that the Internal Affairs Unit commence an investigation to ascertain the facts and circumstances that culminated in Sanders's use of force against Baker. In the Columbia Police Department, any use of force resulting in a

4

serious physical injury or an injury for which a person is transported to a hospital must be investigated by the Internal Affairs Unit.[3] On August 23, 2011, Sanders was notified that the Internal Affairs Unit would conduct a mandatory review of the force used against Baker and that Sanders was the subject of the internal investigation. The following day, Sanders was notified that Chief Burton requested that an amended notification of investigation be issued to Sanders that contained an internal complaint/allegation of violating General Order 103.01, Code of Conduct, Section 32, Duty to Use Reasonable Force. On August 26, 2011, the Internal Affairs Unit issued a second amended notification of investigation to Sanders, advising him that City of Columbia Chapter 19 (Personnel Policies, Procedures, Rules and Regulations), Section 225, Guidelines for Corrective Action would be considered during the course of the investigation. On August 31, 2011, the Internal Affairs Unit issued a third amended notification of investigation to Sanders, informing him that Internal Affairs was directed by Chief Burton to include an additional allegation of violating department policy regarding not providing appropriate medical aid to the injured prisoner.

The Internal Affairs Unit interviewed Officers Kasper, Sedgwick, Crites, Hibler, and Sanders; Sanders's direct supervisor, Sgt. Houston; the Department's use of force instructor; the paramedic who treated Baker; all police reports regarding contact with Baker; Sanders's training records; and videos from the police station holding cell and booking room and from officers' patrol cars. Baker refused to be interviewed. The thirty-nine-page Internal Affairs Unit's Report concluded with recommendations that the violations of the Department's Code of Conduct policy, Duty to Use Reasonable Force; the Department's Use of Force Policy, Medical Attention; and the City of Columbia's Guidelines for Corrective Action be considered "Unfounded." By

---

[3] Under General Order 103.07, "The PSD/IA shall conduct internal investigations into all incidents during which any person sustains serious physical injury, or an injury for which the person is transported to a hospital, due directly to the actions of an employee."

this finding, the Internal Affairs Unit explained that "the allegation of misconduct did not occur even though the underlying events did." The Internal Affairs Unit's report was circulated to Sanders's chain of command so they could review the report and indicate whether they concurred with the recommendations. The Chief of Police is not bound by the Internal Affairs Unit's disciplinary recommendations. Indeed, Chief Burton ignored the findings and recommendations of the Internal Affairs Unit and terminated Sanders's employment effective September 21, 2011.[4]

Sanders appealed the Chief's decision by initiating a grievance on September 30, 2011. On October 14, 2011, Chief Burton denied Sanders's grievance. Sanders appealed to the City's Director of Human Resources, which upheld the Chief's decision. Upon completion of the administrative appeal process mandated by section 19-238 of the Columbia, Missouri, Code of Ordinances ("Code"), Sanders requested a hearing before the City's Personnel Advisory Board ("PAB").

The PAB held an evidentiary hearing on November 15, 2013. The PAB recommended by a four-to-two decision that Sanders should be terminated. On November 26, 2013, the chairperson of the PAB reported the recommendations of the PAB to the City Manager,[5] pursuant to section 19-239 of the Code.

---

[4] Under Columbia Code of Ordinances ("Code") section 19-228, "all department heads shall have the authority and responsibility to administer all disciplinary actions including termination of services of an employee under their supervision."

[5] Under section 19-239 of the Code:

> After hearing and consideration of the evidence and within ten (10) working days after the hearing, the board shall render its recommendations in writing to the city manager. As soon as possible after the hearing, a certified written transcript of the hearing along with all exhibits produced at the hearing shall be delivered to the city manager.

On December 26, 2013, the City Manager issued his twenty-four-page Findings of Fact, Conclusions of Law, and Final Determination on Sanders's grievance.[6] The City Manager determined that the force used by Sanders was unreasonable, unnecessary, and retaliatory; and that Sanders's treatment of Baker was abusive and improper. The City Manager determined that Sanders should not be terminated for failing to provide medical attention to a prisoner in his custody, but that termination on each of the other two charges was warranted.

Sanders petitioned the circuit court for judicial review of the City Manager's decision. The circuit court, reviewing the petition as a *contested* case, issued its judgment reversing the City Manager's decision, finding that the decision was unsupported by competent and substantial evidence; was unauthorized by law; was arbitrary, capricious, and unreasonable; and was an abuse of discretion.

The City appealed.

**Standard of Review**

The resolution of this appeal rests on whether the circuit court was statutorily authorized to treat the City's final decision, by and through its City Manager, as a contested case as defined by the Missouri Administrative Procedure Act ("MAPA"). *See 450 N. Lindbergh Legal Fund, LLC v. City of Creve Coeur*, No. ED102404, 2015 WL 3759314, at *1-2 (Mo. App. E.D. June 16, 2015). We review this question of law *de novo*. *McCoy v. Caldwell Cty.*, 145 S.W.3d 427, 428 (Mo. banc 2004); *Kunzie v. City of Olivette*, 184 S.W.3d 570, 572 (Mo. banc 2006). *See also City of Valley Park v. Armstrong*, 273 S.W.3d 504, 506 (Mo. banc 2009) ("The classification of a case as 'contested' or 'noncontested' is determined as a matter of law.").

---

[6] Under section 19-239 of the Code, "The city manager shall review the transcript and exhibits and, within thirty (30) days of receiving the transcript, render a decision supported by findings of fact and conclusions of law which shall be final, binding and not subject to further administrative appeal."

**Analysis**

Under MAPA, any person who has exhausted all administrative remedies provided by law and who is aggrieved by a final decision in a "contested case" is entitled to judicial review by a circuit court of the county of proper venue. §§ 536.100, 536.110. Section 536.010(4) defines a "contested case" as "a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing." The "law" requiring a hearing "includes any ordinance, statute, or constitutional provision that mandates a hearing." *McCoy*, 145 S.W.3d at 428.

In this case, section 19-23 of the City's municipal code creates the PAB to "hear appeals from corrective/disciplinary actions against city employees which result in disciplinary demotion, suspension, or dismissal of an individual." § 19-23(c)(3). The hearing is conducted by procedures and rules established by the PAB. § 19-239. The employee filing the grievance has the option of having the hearing open or closed and has the right to be heard and to present evidence. *Id.* Testimony is given under oath, and a record is made of the hearing, but technical rules of evidence do not apply. *Id.* Each party, as well as the PAB, may engage counsel and call witnesses. *Id.*

Within ten working days after the hearing, the PAB renders its recommendations in writing to the City Manager. *Id.* As soon as possible after the hearing, a certified written transcript of the hearing along with all exhibits produced at the hearing is delivered to the City Manager. *Id.* The City Manager is required to review the transcript and exhibits and, within thirty days of receiving the transcript, render a decision supported by findings of fact and conclusions of law. *Id.* There is nothing in section 19-239 of the City's municipal code that *limits* the City Manager to the transcript and evidence presented before the PAB. *Id.* In any

8

event, the City Manager's decision "shall be final, binding and not subject to further administrative appeal. " *Id.*

The fact that the PAB held a hearing is not dispositive of whether this is a contested case as defined by section 536.010(4). "Not all hearings are sufficient to comply with the requirements of the MAPA and thereby create a contested case." *Wooldridge v. Greene Cty.*, 198 S.W.3d 676, 684 (Mo. App. S.D. 2006). "[T]o trigger jurisdiction for contested case review under section 536.010(2), the hearing mandated by law . . . also must be one 'in which legal rights, duties, or privileges of specific parties . . . are to be determined.'" *McCoy*, 145 S.W.3d at 428.

In *McCoy* and *Kunzie*, the Supreme Court addressed the circumstances under which an employee's grievance hearing will trigger contested case review. "In *McCoy*, a sheriff fired two of his deputies. Thereafter, each deputy requested a hearing before a three-person statutory review board. The board conducted its hearing, . . . prepared a written report[,] and forwarded it to the sheriff for his consideration." *Wooldridge*, 198 S.W.3d at 684. In concluding that the hearing did not trigger contested case review, the Supreme Court stated:

> Although there is to be a hearing, and findings of fact are to be made, and the sheriff must review those findings, the sheriff still "has the final decision-making authority," and the statute does not subject that decision to any gauge or criteria. Indeed, absent such statutory direction, the sheriff can terminate the deputies even in the face of findings that wholly support the deputy's continued employment. In other words, even in view of the mandated hearing, the deputies are no less at will employees. That is, they are employees who can be terminated for cause or for no cause at all, absent, of course, any recognized public policy exception.

*McCoy*, 145 S.W.3d 428-29.

Similarly, in *Kunzie*, "the city manager fired a city employee. The city code created an advisory body to hear appeals by city employees concerning their discharge and make written recommendations to the city manager. The city manager, however, still had the right to make the

9

final decision." *Wooldridge*, 198 S.W.3d at 684. In applying the analysis in *McCoy* to conclude that contested case review had not been triggered, the Supreme Court stated:

> As in *McCoy,* the hearing procedures here do not determine a city employee's legal rights, duties, or privileges. The board is merely advisory. Likewise, after receiving the board's recommendations, the city manager is vested with the ultimate decision making authority. As in *McCoy*, the city manager's decision is not subject to any "gauge or criteria," and the city manager can fire a city employee despite contrary recommendation findings. This is not a contested case . . . .

*Kunzie*, 184 S.W.3d at 573.

Finally, in *Wooldridge*, the Greene County Highway Administrator fired an employee of the Greene County Highway Department. Between the Greene County Personnel Policy Manual and a Union Resolution that covered employees like Wooldridge, who could only be terminated for just cause, an advisory body was created to hear termination appeals in which the interested parties were entitled to appear to present, examine, and cross-examine witnesses at any hearing before this administrative body. *Wooldridge*, 198 S.W.3d at 681. However, this administrative body only made written recommendations to the Highway Administrator to consider; the Highway Administrator still retained the final decision-making authority, and the Administrator's decision was not subject to any gauge or criteria. *Id.* at 685. Relying upon *McCoy* and *Kunzie*, the *Wooldridge* court concluded that the hearing Wooldridge received before the personnel advisory administrative body did not serve to determine Wooldridge's legal rights, duties, or privileges to continued employment with the Greene County Highway Department; hence, the process afforded Wooldridge did not constitute a contested case, and the *Wooldridge* court remanded the matter to the circuit court for judicial review of the propriety of Wooldridge's termination as a noncontested case. *Id.*

Here, as in *McCoy*, *Kunzie*, and *Wooldridge*, although Sanders received an evidentiary hearing before the PAB, that portion of Sanders's grievance procedure did nothing to determine his legal rights, duties or privileges relating to continued employment. The PAB only made written recommendations to the City Manager when it submitted the record of its proceedings for final determination, and the City Manager's discretion was not subject to adequate gauge and criteria. Though the evidentiary proceeding before the PAB was somewhat formal (in that each party was represented by counsel that examined and cross-examined witnesses), the corresponding record developed by the PAB proceeding, as prescribed by the City's Code, did *not* serve as an *exclusive* record to which the decision maker was limited in arriving at a final decision. Instead, the final decision-making authority was vested in the independent discretion of the City Manager. For although the City's Code required the City Manager to *review* the transcript and exhibits compiled by the PAB, there is nothing in the City's Code *limiting* the City Manager to that evidence, and there is certainly no requirement that the City Manager accept any recommendations of the PAB in arriving at a final decision on Sanders's legal right to continued employment.

> As in *McCoy*, the hearing procedures here do not determine a city employee's legal rights, duties, or privileges. The [personnel appeals] board is merely advisory. Likewise, after receiving the board's recommendations, the city manager is vested with the ultimate decision making authority. As in *McCoy*, the city manager's decision is not subject to any "gauge or criteria," and the city manager can fire a city employee despite contrary recommendation findings [by the personnel appeals board].

*Kunzie*, 184 S.W.3d at 573.

Simply put, in order to achieve "contested case" status, the "hearing" portion of the grievance process must allow each party to be heard and to address the evidence of the opposing party that ultimately will be relied upon by the person or entity making the final decision. In

11

other words, the result of the hearing must be "meaningful." Absent a hearing that, in some real sense, confines the final decision maker, the evidentiary hearing is nothing more than "window dressing," and any claimed due process afforded by such a hearing is fictional.

In this case, the evidentiary hearing before the PAB was not meaningful in that the City Manager was not limited (by the City Code) in any manner by the evidence adduced at the PAB hearing prior to the City Manager's final involvement and decision relating to Sanders's continued employment. Guided by *McCoy* and *Kunzie*, if in the end the ultimate decision maker operates independently from the hearing (as is the case here), no meaningful hearing has been afforded, and the grievance process cannot be considered a contested case proceeding. This is what our Supreme Court meant when it stated in *McCoy* and *Kunzie* that the ultimate decision maker must be subject to some "gauge or criteria."

Consequently, "[b]ecause the hearing [before the PAB] was not one in which [Sanders's] 'legal rights, duties or privileges [were] to be determined,' this is not a 'contested case.'" *McCoy*, 145 S.W.3d at 429. Given the pleadings and procedural history of this case, the circuit court lacked authority to afford judicial review as a contested case, *450 N. Lindbergh Legal Fund*, 2015 WL 3759314, at *4, and so do we. While both parties are seeking judicial review of the City's decision to terminate Sanders, whether that review is of a contested or noncontested case,[7] the pleadings and procedural history dictate that such judicial review must be that of a

---

[7] That said, appellate review of contested and noncontested cases are governed by different standards, which is why it is important that the circuit court proceed under the appropriate umbrella of review. As we explained in *State ex rel. Christian Health Care of Springfield, Inc. v. Missouri Department of Health & Senior Services*:

> On appeal from the circuit court of a noncontested administrative decision, we review the judgment of the circuit court, rather than the decision of the administrative agency. As such, our review is essentially the same as for other judgments in a judge-tried case. In reviewing a judge-tried case, we are governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), and we will affirm the decision of the trial court unless it is not supported by substantial and competent evidence, is against the weight of the evidence, or erroneously declares or applies the law.

noncontested case. Thus, we conclude that remanding the case for proceedings consistent with this opinion is appropriate.

## Conclusion

The judgment is reversed, and the case is remanded to the circuit court to judicially review the matter as a noncontested case pursuant to section 536.150.[8]

_____

Mark D. Pfeiffer, Presiding Judge

Lisa White Hardwick and James Edward Welsh, Judges, concur.

---

229 S.W.3d 270, 275 (Mo. App. W.D. 2007) (internal quotation and citations omitted). On the other hand, in a contested case, the appellate court reviews the findings of fact and conclusions of law of the agency, not the judgment of the circuit court. *Ehler v. Mo. State Highway Patrol*, 254 S.W.3d 99, 100 (Mo. App. W.D. 2008). The agency's decision will be affirmed if the findings are supported by competent and substantial evidence in the record. *Id.* at 101.

[8] We note that timeliness of appeal is not an issue as a petition for review of a noncontested case need only be commenced within a reasonable time and such is the case in this proceeding. *Wooldridge v. Greene Cty.*, 198 S.W.3d 676, 683 (Mo. App. S.D. 2006). In judicial review of a noncontested case, "[t]he circuit court does not review the [agency] record for competent and substantial evidence, but instead conducts a *de novo* review in which it hears evidence on the merits, makes a record, determines the facts and decides whether the agency's decision is unconstitutional, unlawful, unreasonable, arbitrary, capricious or otherwise involves an abuse of discretion." *City of Valley Park v. Armstrong*, 273 S.W.3d 504, 508 (Mo. banc 2009) (citing § 536.150). "The circuit court does not defer to facts found or credibility assessed by the agency and need not conform doubtful evidence to the agency's decision." *Id.* "The circuit court in a noncontested case acts to determine the evidence and give judgment from that evidence." *Id.* That said, on remand, there is nothing preventing the parties from stipulating to the circuit court that it may determine Sanders's right to continued employment based upon any transcript, depositions, or set of exhibits upon which they may choose to agree; conversely, there is nothing *requiring* the parties to present evidence to the circuit court in that fashion.